**Joseph MULLIN, Appellant,**

v.

**N STREET FOLLIES LIMITED PARTNERSHIP, Appellee.**

**No. 96–CV–1088.**

District of Columbia Court of Appeals.

Argued Jan. 21, 1998.

Decided May 21, 1998.

As Revised July 7, 1998.

---

Joseph Mullin, pro se.

Mark E. Brodsky, Bethesda, MD, for appellee.

Before STEADMAN, SCHWELB and RUIZ, Associate Judges.

STEADMAN, Associate Judge:

In this appeal we are asked to define the proper interplay between *Drayton v. Poretsky Management, Inc.,* 462 A.2d 1115 (D.C. 1983), allocating primary jurisdiction to the administrative agency to determine the validity of rent increases,[1] and the broad discretionary power of a trial judge to fashion protective orders in suits before the Landlord and Tenant Branch of the Superior Court. Specifically, the primary issue before us is whether the rule of *Drayton* prohibits the trial court, in a suit for nonpayment of rent, from modifying a protective order to reflect a rent increase approved by the Rent Administrator in a separate proceeding, where administrative appeals of the approval have not been exhausted but where the Rental Housing Commission has refused to stay enforcement of the increase. Appellant defaulted on a protective order so modified, whereupon the trial court struck his responsive pleadings and entered judgment of possession for appellee. We affirm.

## I.

The present dispute arose with a November 1992 complaint filed by appellee N Street Follies Limited Partnership ("N Street Follies" or "landlord"), seeking possession of the residential unit appellant Joseph Mullin ("tenant") occupied at 1755 N Street, N.W. The suit, commenced in the Landlord and Tenant Branch of the Superior Court, alleged nonpayment of two months' rent at the rate of $400 per month. The parties consented to a protective order requiring the tenant to pay $300 per month, the amount of undisputed rent, into the court registry. Soon thereafter, the court imposed a stay pursuant to

*Drayton,* deferring to the Rental Housing Commission ("Commission" or "RHC") to resolve the parties' dispute over the proper rent amount, but kept the protective order in force.

On August 24, 1993, the landlord filed a hardship petition with the Rental Accommodations and Conversion Division ("RACD") of the District of Columbia Department of Consumer and Regulatory Affairs. *See* D.C.Code §§ 45–2516(c), –2522 (1996). The Rent Administrator granted the petition, approving a monthly rent increase to $1,168. The tenant took an appeal to the Commission, which was dismissed on April 30, 1998. In the meantime, however, the Commission, on the landlord's motion, refused to recognize an automatic stay of the Rent Administrator's decision, citing *Cafritz Co. v. District of Columbia Rental Hous. Comm'n,* 615 A.2d 222 (D.C.1992). Rather, it held that the landlord could collect the increased rents pending appeal unless the tenant established an escrow account in the amount of the increase or purchased a supersedeas bond. *See* 14 DCMR §§ 3802.10, 3806 (1991).

Noting that the tenant did not secure a stay, the trial court granted an increase in the amount of the protective order from $300 to $1,168 per month, effective September 5, 1995. On August 9, 1996, after finding that the tenant failed to comply with the modified protective order, the trial court struck the tenant's pleadings and entered judgment of possession for the landlord. The court also set what it called a *Trans–Lux*[2] amount equal to the total unpaid installments of the modified protective order.

We stayed execution of the judgment pending the outcome of the present appeal and instructed the tenant to pay into the court registry any arrearage that had accrued since his last protective order payment at the initial rate of $300 per month. In affirming the judgment, we now lift that stay.[3]

---

1. The detailed holding of *Drayton* is quoted and discussed in Part III.A, *infra.*

2. *Trans–Lux Radio City Corp. v. Service Parking Corp.,* 54 A.2d 144 (D.C.Mun.App.1947).

3. The landlord's pending motion to that effect now before us is therefore dismissed as moot.

## II.

■ Before addressing appellant's substantive arguments, we first consider the threshold procedural question whether the landlord prematurely filed the instant nonpayment action. Prior to the entry of judgment against him, the tenant moved to dismiss the case, contending the landlord failed to supply proper notice to cure or vacate, as the tenant claimed was required by the Rental Housing Act of 1985, D.C.Code § 45–2551(b) (1996). Initially, the trial court granted the motion, but later reversed itself, citing § 45–2551(a) and its exception of rent nonpayment cases from the notice provisions of the Act. We agree with the trial court's reading of § 45–2551(a).[4]

### A.

On October 15, 1992, the landlord served the tenant with a "Notice to Quit and Vacate" his apartment for failure to pay rent due on October 1, 1992. The notice listed an expiration date of November 14, 1992, thirty days from the date of service. The tenant refused to vacate, and on November 16, 1992, the landlord commenced the present suit for possession. The tenant moved to dismiss the suit as premature, arguing, as he does here, that under D.C.Code § 45–2551(b) and relevant caselaw he was entitled to a thirty-day "Notice to Cure or Vacate" that could not expire any sooner than on the day of the month upon which his tenancy commenced.[5]

4. Given this holding on appeal, we may assume, without deciding, that the tenant's ability to raise this particular issue survived the striking of the pleadings as a result of his default under the protective order. See Jamison v. S & H Assocs., 487 A.2d 619, 621 (D.C.1985) (holding that where landlord gave no notice at all, tenant could raise issue notwithstanding noncompliance with a protective order, since notice was a "condition precedent" to filing suit).

5. The tenant claims, and the landlord does not dispute, that his tenancy commenced on June 1, 1987.

6. We commented on the

awkwardness of construing the statutory thirty day cure period in the context of the rental obligation to pay rent on time, as opposed to many other rental obligations which are not

By this reasoning, the landlord's suit could not have been filed until December 1, 1992.

### B.

The Rental Housing Act of 1985 generally protects a residential tenant from eviction, notwithstanding the expiration of the tenant's lease. See D.C.Code § 45–2551(a). The eviction section of the Act outlines specific exceptions to this rule and sets forth the conditions under which eviction of residential tenants may proceed. Regarding notice, the Act provides, "[n]o tenant shall be evicted from a rental unit for any reason other than for nonpayment of rent unless the tenant has been served with a written notice to vacate which meets the requirements of this section." Id.

The notice requirement generally dealing with defaults in lease obligations is that contained in D.C.Code § 45–2551(b): "a housing provider may recover possession of a rental unit where the tenant is violating an obligation of tenancy and fails to correct the violation within 30 days after receiving from the housing provider a notice to correct the violation or vacate." In Pritch v. Henry, 543 A.2d 808, 811–12 (D.C.1988), we construed this provision to require more than a strict thirty-days' notice when the alleged lease violation is the obligation to pay rent in a timely manner.[6] For all other lease obligations covered by the Rental Housing Act, we have held that this unique timing requirement does not apply; rather, the tenant is

time dependent.... [A]lthough the obligation to pay rent on time is in a sense a continuous one, that obligation only arises periodically, that is, on whatever day of the month the lease designates rent is due. Thus, for the tenant to have the benefit of the full statutory period, we hold that the cure period for an obligation to pay rent on time will expire, not thirty days after the notice is received, but rather on the first day of the rental period immediately following the lapse of the thirty day notice period which commences on receipt of the notice. Pritch, supra, 543 A.2d at 811–12. Applying this reasoning to the facts of Pritch, we concluded that for the tenant to receive the full benefit of the thirty-day notice period of § 45–2551(b), mid-January service of the notice did not expire until March 1 because the latter date would be the tenant's first opportunity, with sufficient notice, to cure the alleged defect, i.e., tender a timely rent payment. Id. at 812 & n. 6.

entitled only to the strict thirty-day period recited in § 2551(b). *Cormier v. McRae,* 609 A.2d 676, 681 (D.C.1992).

Unlike *Pritch,* however, the basis for the instant possession suit was not late payment but nonpayment of rent over the course of two months. To such cases, the notice provisions of the Rental Housing Act expressly do not apply. *See* D.C.Code § 45–2551(a) ("No tenant shall be evicted from a rental unit for any reason *other than for nonpayment of rent* unless the tenant has been served with a written notice to vacate which meets the requirements of this section.") (emphasis added).[7] We therefore look only to the notice-to-quit provisions of D.C.Code §§ 45–1401 *et seq.* (1996). Here, pursuant to § 45–1404, the landlord gave the tenant notice to quit that properly expired "on the 30th day after the day of service of the notice."[8] Thus, the landlord timely commenced the instant possession suit.

The tenant asserts that § 45–2551 does encompass nonpayment cases despite the express language to the contrary contained in § 45–2551(a), and further maintains that tenants in nonpayment cases are entitled to the same notice provided in *Pritch.* We reject both arguments. First, we must give effect to the unambiguous, plain meaning of § 45–2551(a). *See Berryman v. Thorne,* 700 A.2d 181, 184 (D.C.1997) (citing *Gibson v. Johnson,* 492 A.2d 574, 577–78 (D.C.1985)) (holding that court will not look beyond plain, unambiguous language of statute so long as it does not produce an absurd result). That provision, as it plainly expresses, excludes nonpayment cases from the notice requirements found throughout § 45–2551.[9]

Addressing the tenant's second point, even if we were to conclude that § 45–2551 does apply to nonpayment cases, the special timing requirements of *Pritch* still would not be operative. To be sure, *Cormier,* in citing *Pritch,* notes that "in a case where the tenant had violated a lease obligation *other than the obligation to pay rent,* this timing restriction [allowing more than thirty days] would not apply," 609 A.2d at 681 (emphasis added), indicating that perhaps the restriction does

---

7. In this regard, there is no tension with the § 45–2551(b) requirement that notice be provided where the landlord seeks eviction for violations of an "obligation of tenancy." As D.C.Code § 45–2571 (1996) suggests, the term "obligation of tenancy" includes all obligations except the obligation to pay rent: "Nothing contained in this section shall be construed to limit a housing provider's right to evict a tenant for nonpayment of rent *or* violation of an obligation of the tenancy, if the action to evict is in compliance with § 45–2551." (Emphasis added).

A close examination of earlier versions of the rent control law reveals this dichotomy as well. The Rental Housing Act of 1977, 24 D.C.Reg. 5334 (1977), isolates the obligation to pay rent: "[The Act] would prevent evictions unless either a tenant fails to pay his rent *or* violates an obligation of his tenancy...." Council of the District of Columbia, Section by Section Summary of Bill 2–152, "District of Columbia Rental Accommodations Act of 1977," at 5 (Sept. 22, 1977) (emphasis added). The Rental Accommodations Act of 1975, 22 D.C.Reg. 1143 (1975), also makes this separation: "[e]viction control is also tightened by a ninety day (rather than thirty day) notice requirement for all evictions except those due to non-payment of rent, illegal action, *or* violation of a tenancy obligation by a tenant." Council of the District of Columbia, Report on Bill 1–157, "The Rental Accommodations Act of 1975," at 10 (July 31, 1975) (emphasis added).

8. We read the record to establish that the tenant here is a tenant by sufferance. *See* D.C.Code § 45–220 (1996). Therefore, the termination provision of § 45–1404 applies.

9. The tenant presents several creative arguments to support his contention that § 45–2551(a) does not, contrary to its plain terms, in fact exclude nonpayment of rent cases. First, he cites *Burns v. Harvey,* 524 A.2d 35, 38 n. 6 (D.C.1987), for the proposition that the exclusion of nonpayment of rent cases found in § 45–2551(a) merely indicates that in such cases, unlike other cases, a party may waive the notice provisions of that section. This is an improper reading of *Burns,* which states,

> While it is true that [D.C.Code] § 45–1408 provides for a waiver under some circumstances, no waiver provisions exist in the more recent code provision, § 45–2551, *requiring written notice before a tenant may be evicted (except for nonpayment of rent).*

*Id.* (emphasis added). *Burns* simply bolsters our conclusion here that § 45–2551 excludes rent nonpayment cases altogether; the case says as much in the above-quoted passage.

Second, the tenant suggests that § 45–2551, when read in conjunction with the last sentence of § 45–2571 and 14 DCMR § 4300.3 (1991), supports the construction that he urges. In our view, those sections are themselves susceptible to varying interpretations and are thus insufficient to overcome the strong presumption favoring a plain-language reading of § 45–2551.

govern nonpayment cases. This conclusion was based on a reading that, "for nonpayment cases,"

> [*Pritch*] held not only that § 45–2551(b) itself required a thirty-day notice to cure or vacate but also ... that the cure period will expire, not thirty days after the notice is received, but rather on the first day of the rental period immediately following the lapse of the thirty day notice period which commences on receipt of the notice.

*Id.* (internal quotation marks omitted).

In this dictum, however, *Cormier* spoke too broadly. As noted above, *Pritch* did not involve nonpayment as such but rather a default based upon untimely payment. *Pritch* expressly held that, because of the unique nature of this particular type of lease violation, involving a question of timeliness, the tenant could not receive the full benefit of his statutorily granted thirty-day notice period unless such period expired on the first day of the rental period following the lapse of the thirty days. *See* note 5, *supra.* This reasoning is inapplicable to most other lease-obligation violations, including failure to pay rent. *Cormier* is not controlling here.

## III.

Turning to the merits of the case, the tenant asserts that the trial court erred in modifying the protective order amount to reflect the decision of the Rent Administrator. The modification, he claims, initiated before the administrative appellate process had run its course, was tantamount to an adjudication of the validity of the hardship increase and thus a violation of *Drayton.* He further argues that the court's decision to strike the pleadings and enter judgment amounted to a premature lifting of the *Drayton* stay. Finally, he alleges error in the setting of the *Trans–Lux* amount to incorporate the hardship increase, which had yet to be finally adjudicated by the Commission. *We think* these arguments, if accepted, would strip the protective order of its proper role in landlord-tenant possessory litigation.

### A.

■ To promote "proper relationships between the courts and administrative agencies," we have consistently invoked the doctrine of primary jurisdiction in connection with challenges to the legality of rent increases. *Mack v. Zalco Realty, Inc.,* 630 A.2d 1136, 1140 n. 9 (D.C.1993) (quoting *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)); *see also Robinson v. Edwin B. Feldman Co.,* 514 A.2d 799, 800 (D.C.1986); *Drayton, supra,* 462 A.2d at 1118–19. Specifically, while the Landlord and Tenant Branch of the Superior Court has jurisdiction over possessory actions, *see* D.C.Code § 16–1501 (1997); D.C.Code § 45–1410 (1996); *Estate of Ellis ex rel. Clark v. Hoes,* 677 A.2d 50, 51 (D.C.1996),

> when there is pending before the [Rent] Administrator or the RHC a challenge to a rent increase that bears upon the amount of rent owed by a tenant defending a possessory action brought for nonpayment of rent, the L & T Judge should stay the action to await the ruling of the Administrator or, if an appeal is taken to the RHC, then of that body.

*Drayton, supra,* 462 A.2d at 1120. This rule derives from the principle that we "generally defer to agencies for initial resolution of issues the legislature has put in their special competence." *District of Columbia v. Thompson,* 570 A.2d 277, 287 (D.C.1990). *See also RDP Dev. Corp. v. District of Columbia,* 645 A.2d 1078, 1083 (D.C.1994). Primary jurisdiction advances two important policy objectives: greater uniformity of result and the utilization of the specialized and expert knowledge of the agency. *Thompson, supra,* 570 A.2d at 287. The lesson of *Drayton* is plain: the Commission, not the trial court, must adjudicate the merits of a rent increase.

■ The question then before us is whether the modification of a protective order to reflect an increase not yet finally approved by the Commission constitutes an adjudication on the merits under *Drayton.* We hold that it does not. An adjudication is "[t]he formal giving or pronouncing [of] a judgment or decree in a court proceeding,"

which "contemplates that the claims of all parties thereto have been considered and set at rest." BLACK'S LAW DICTIONARY 42 (6th ed.1990). The *Drayton* proscription against judicial determination of rent increases seeks to prevent the courts from intruding unduly into the province of the Rental Housing Commission, whose primary authority flows directly from the rent control laws. *See* D.C.Code § 45–2514(c) (1996); *Interstate Gen. Corp. v. District of Columbia Rental Accommodations Comm'n,* 441 A.2d 252, 254 (D.C.1982). However, the remedy of a protective order, by its very nature, has no direct connection to the Commission's function of interpreting and applying the rent control laws. A protective order is, rather, "an equitable remedy designed to ensure that the landlord is not 'exposed to a prolonged period of litigation without rental income' while the tenant remains in possession pending the outcome of a suit for possession." *R & A, Inc. v. Kozy Korner, Inc.,* 672 A.2d 1062, 1071 (D.C.1996) (quoting *Davis v. Rental Assocs., Inc.,* 456 A.2d 820, 823 (D.C. 1983) (en banc)). "This type of order is an interim order and is not a determination of the merits of a case." *Id.* The protective order "preserve[s] the status quo in a contested suit for possession until it can be determined on its merits. Such an order is a creature of courts, fashioned out of equity, to maintain the proper balance, *pendente lite,* in the unique arena of landlord-tenant litigation." *Davis, supra,* 456 A.2d at 829; *see also McQueen v. Lustine Realty Co., Inc.,* 547 A.2d 172, 179 (D.C.1988).[10]

In the case before us, the Rent Administrator had approved the hardship increase and the Commission itself had permitted the landlord to collect the increased rent pending final determination unless the tenant complied with escrow or bond provisions, designed to protect the landlord, of an adminis-

trative type akin to a court protective order. This the tenant declined to do. In such a posture of this case, we can hardly say that the trial court abused its discretion in increasing the amount of the protective order as it did. This action plainly presented no interference with the proper role of the Commission protected by the *Drayton* principle.

### B.

■ The tenant further asserts that the trial court's decision to strike his pleadings and enter judgment for the landlord amounted to a premature lifting of the *Drayton* stay. *See Mack, supra,* 630 A.2d at 1139. We disagree. It is well settled that where a tenant fails to comply with a protective order, the trial court may strike the tenant's pleadings and enter judgment for the landlord. This is "an appropriate sanction for a trial court to impose in the exercise of its equity power when the tenant has neither abided by the terms of the order nor sought to modify such order." *Davis, supra,* 456 A.2d at 827.

■ The sanction is not an adjudication of the validity of a particular rent amount but rather a mechanism for the court to enforce its order. "[J]udgment for possession based on non-payment of a protective order does not have collateral estoppel effect." *Kozy Korner, supra,* 672 A.2d at 1071. As we have observed, "the striking of Tenant's pleadings will affect [the tenant] only insofar as it precludes [the tenant] from continuing to live in an apartment at which she [or he] is demonstrably unable to pay the rent." *Mahdi v. Poretsky Management, Inc.,* 433 A.2d 1085, 1090 (D.C.1981) (quoting *Arthur E. Morrisette Real Estate v. Hunt,* 109 Daily Wash.L.Rptr. 901 (D.C.Super.Ct. Apr. 8, 1981)) (alterations in original). The remedy

---

10. *Early v. Dorchester House Assocs.,* 629 A.2d 583 (D.C.1993), does not contradict the conclusion we reach here. In *Early,* the tenants moved the trial court to reconsider a decision to increase a protective order, based on a rent increase approved by the Rent Administrator, asserting they had insufficient opportunity to present their argument countering the increase that the condition of the rental accommodation violated provisions of the housing code. We reversed the denial of such motion, agreeing that

the tenants were deprived of the opportunity to defend against the increase and that such deprivation was not owing to their lack of diligence. However, despite the fact that a *Drayton* stay had been imposed, nowhere do we make reference to this fact in our discussion of the validity of the protective order increase. There is no indication that the tenants challenged the protective order increase as a violation of *Drayton.* Likewise, there is no indication that we perceived a *Drayton* problem.

does not "otherwise foreclose [the tenant's] rights.... [The tenant] remains free to sue" under any civil theory available to him. *Id.* at 1089 (quoting *Arthur E. Morrisette Real Estate, supra*) (alterations in original).

In *Mack,* after the landlord commenced a possessory action in the Superior Court, the tenant filed a petition with the Rental Accommodations and Conversion Division ("RACD"), alleging, *inter alia,* that the landlord illegally charged a rent increase. Shortly after a *Drayton* stay had been imposed, an RACD hearing examiner denied the petition and, despite a pending appeal to the Commission, the trial court granted the landlord's motion to lift the stay.

On appeal, we rejected the landlord's argument that the tenant's failure to seek an administrative stay pursuant to Commission regulations justified the trial court's decision to lift the *Drayton* stay. We held that the "decision to seek, or not to seek, a stay from the RHC during the pendency of an appeal to the RHC" could not "deprive the agency of primary jurisdiction." *Mack, supra,* 630 A.2d at 1140. We reasoned,

> There was an ongoing dispute between the parties over the amount of rent owed under the lease. The landlord's success in its suit in the landlord and tenant court, which was based on non-payment of rent, was therefore contingent on a determination of the agency ... that the amount of rent it claimed to be owed was lawful. Since there had not yet been a final administrative decision on that issue, the trial court should not have lifted the *Drayton* stay....

*Id.*

■ Here, pursuant to *Mack,* it would certainly have been improper for the trial court, without more, to lift the *Drayton* stay until after the administrative appellate process was completed. However, as noted above, the court did no such thing;[11] it instead

raised the protective order amount in recognition of the increased likelihood, given the Rent Administrator's decision, that the landlord's hardship increase would be approved, and in light of the fact that, because no administrative stay had been granted, the increase could be charged immediately. *See Cafritz, supra,* 615 A.2d at 228–29.[12] The trial court here did not enter judgment for the landlord based on the decision of the Rent Administrator ratifying the hardship increase, thus lifting the *Drayton* stay prematurely. Rather, the court simply exercised its discretionary power over the equitable protective order remedy. The sanction arose because of the tenant's noncompliance, not with his rent obligations, but with the court's order.

### C.

Finally, the tenant asserts that the post-judgment setting of a *Trans–Lux* figure equal to the aggregate amount of missed protective order payments violated *Drayton* because it "represents the judicial determination of the lawful amount of rent to which the landlord is entitled." He claims that to honor the *Drayton* stay, a *Trans–Lux* amount could not be set any higher than at the sum of the outstanding undisputed monthly rent. By this reasoning, here the proper *Trans–Lux* figure would be scaled to a monthly rent of $300.

■ It is axiomatic that a tenant may avoid forfeiture of a lease for nonpayment of rent upon tender to the landlord of all outstanding rent, with interest and costs, at any time prior to actual eviction. *Gause v. C.T. Management, Inc.,* 637 A.2d 434, 438 (D.C. 1994) (citing *Trans–Lux, supra* note 2, 54 A.2d at 146). This is the so-called *Trans–Lux* equitable right of redemption. Ordinarily, where there is a petition pending with the Commission challenging the validity of a

---

11. Moreover, since *Mack* did not address the effect of *Drayton* and the refusal of the agency to grant a stay in the context of a default under a protective order and the setting of a *Trans–Lux* figure, it is therefore not controlling on that latter point, discussed *infra.*

12. We recognize that the decision whether or not to seek a stay has no bearing on the trial court's duty to await administrative judgment before adjudicating the landlord's suit for possession. Such decision, however, is highly relevant to the discretionary decision of the trial court to adjust the protective order to reflect changes in the parties' respective interests.

rent increase, the trial court, for purposes of calculating the *Trans–Lux* amount, must either stay the possessory action and await administrative resolution of the challenge or, at the landlord's request, proceed as if no rent increase were involved. *Drayton, supra*, 462 A.2d at 1120. The trial court has no jurisdiction to determine legal rent rates *ab initio;* the premature calculation of a *Trans–Lux* figure would defy this restraint.

This rule, however, cannot be mechanically applied. Indeed, we have recognized that the *Trans–Lux* doctrine itself is subject to exceptions. In *Moore v. Jones*, 542 A.2d 1253 (D.C.1988), for example, the landlord commenced a possessory suit against the tenant for failure to pay several months' rent. Before trial, the parties agreed to and the trial court approved a consent judgment in favor of the landlord. The judgment was stayed pending settlement of a contract for the sale of the rental property to the tenant. When the deal to sell the property collapsed, the landlord moved to vacate the stay. The trial court denied the motion and granted the tenant the right to redeem the tenancy, under *Trans–Lux*, by paying overdue rent. Providing a *Trans–Lux* remedy modified the terms of the consent judgment.

We reversed the decision of the trial court, holding that the tenant's rights under *Trans–Lux* are not absolute. Rather, we maintained, the strong public policy behind *Trans–Lux* and the eviction controls of D.C.Code § 45–2551 (1996) must yield to the competing policy underlying enforcement of consent judgments, which holds that "voluntary settlement of civil controversies is in high judicial favor." *Moore, supra*, 542 A.2d at 1255 (internal quotation marks omitted). We noted that "[a] consent judgment is an order of the court, indistinguishable in its legal effect from any other court order, and therefore subject to enforcement like any

other court order." *Id.* at 1254 (internal quotation marks omitted). Similarly, a protective order is "subject to enforcement like any other court order."

■ To be sure, a tenant threatened with dispossession for violation of a protective order is entitled to avoid eviction under the general *Trans–Lux* principle: the sanction of dispossession "does *not* preclude the tenant, after judgment is entered against him for violation of the protective order, from proceeding to tender to the landlord all monies due and owing" before execution of the judgment. *Davis, supra*, 456 A.2d at 830. But that very case also illustrates the effect upon the calculation of the *Trans–Lux* amount occasioned by the trial court's striking of the tenant's defensive pleadings to the eviction action due to noncompliance with the protective order. *See Mahdi, supra*, 433 A.2d 1085. In *Davis*, the tenant interposed a defense based on noncompliance with the housing code, yet the *Trans–Lux* amount required to forestall possession reflected the full rent.[13] Likewise here, the tenant's failure to comply with the protective order and the consequent striking of all defensive issues removed the issue of the alleged invalidity of the unstayed rent increase from the case for purposes of determining the landlord's right to immediate possession in the present action [14] and the setting of the proper *Trans–Lux* amount.[15]

In fact, the trial court here was content to set what it called the *Trans–Lux* amount at no more than the amount of the back payments due under the protective order. It did not include any interests or costs, *see Davis, supra*, 456 A.2d at 831–32 (Ferren, J., concurring), nor the amount of unpaid rent preceding the filing of the action by the landlord. The trial court here certainly acted within the permissible range of *Davis* when, after exercising its discretion to strike the

13. The tenant preserved the right to continue to seek damages from the landlord for such housing code violations, just as here the tenant is not foreclosed from obtaining any overcharges that may result from an eventual Commission decision in his favor.

14. *See* note 13, *supra*.

15. While the disputed rent increase came about after the filing of the suit for possession, rather than before it, and hence may not have been part of the tenant's pleadings as such, that increase clearly became an issue during the course of the proceedings. For purposes of a *Davis* analysis, we see no basis to distinguish the two situations. The *Trans–Lux* figure is set on the basis of all rent due and owing as of the time of eviction.

tenant's pleadings and enter judgment for the landlord because of the tenant's noncompliance with the modified protective order, it set what it called a *Trans–Lux* figure equal to the total unpaid installments of the protective order. It is hardly an impermissible interference with the primary jurisdiction of the administrative agency to permit the landlord to receive directly the missed increased rental payments that otherwise would have been payable into the court registry when the agency itself contemplated that state of affairs by refusing to stay the Rent Administrator's order.[16]

A holding to the contrary would strip the court of any practical power to enforce its protective order and defeat the entire scheme erected, and so frequently utilized, to maintain a proper balance of interests during the pendency of landlord-tenant litigation. If Mullin or any other tenant could violate a protective order directing payment into the court registry of $1,168 per month, but avoid dispossession by merely paying, on a pure *Trans–Lux/Drayton* theory, at a rate of $300 per month—the amount of undisputed rent— the trial court's discretion in fashioning a protective order in the amount it deems equitable would be impossibly circumscribed.

*Affirmed.*

---

**16.** We express no opinion on whether the trial court could have properly exercised its discretion in setting a higher figure. We hold only that on the facts presented here, the trial court did not violate the rule of *Drayton* in setting the figure at the level that it did.