Mary GRAHAM, Appellant,

v.

LANIER ASSOCIATES, Appellee.

No. 10–CV–675.

District of Columbia Court of Appeals.

Argued Dec. 7, 2010.
Decided May 12, 2011.

---

Hope Hamilton, with whom Shankar Duraiswamy and Franciska A. Coleman, Washington, DC, were on the brief, for appellant.

Stephen O. Hessler, Washington, DC, for appellee.

Beth Mellen Harrison, with whom Julie H. Becker, Bonnie I. Robin–Vergeer, Washington, DC, Anne Smetak, Vytas Vergeer and Rebecca Lindhurst were on the brief, for amici curiae.

Before OBERLY, Associate Judge, KRAMER,* Associate Judge, Retired, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

■ Lanier Associates (Lanier) filed a possession action against appellant Mary Graham alleging nonpayment of rent after Lanier conditionally increased Graham's rent pursuant to a pending hardship petition. Graham defended on the grounds that the hardship petition was flawed, housing code violations reduced the value of her rental unit, and the action was in retaliation for her participation in the building's tenants' association. She moved for a *Drayton* stay,[1] which the trial court granted. Lanier moved for a protective order and, after a *Bell* hearing,[2] the court decided that Graham should make monthly payments of $1,500, $900 to be paid directly to Lanier and the remaining $600 to be deposited into the court registry. Graham noted this interlocutory appeal. *See McQueen v. Lustine Realty Co.*, 547 A.2d 172 (D.C.1988). For the reasons that follow, we order the protective order amount reduced to $1,150 monthly, the amount a motions division of this court ordered Graham to pay ($917 to Lanier, the remaining $233 into the court registry) in staying the trial court's order for the greater amount.

## I. Factual Background

### A. *The Hardship Petition*

D.C.Code § 42–3502.12(a) (2001) entitles a landlord to charge sufficient rent to receive a maximum 12% rate of return on investment. When a landlord is receiving less than the statutory 12%, he may seek a rent adjustment from the Rent Administrator (RA) by filing a hardship petition. *Id.* This triggers a two-step process. First, the RA reviews the submitted petition and supporting documentation and issues an audit report. 14 DCMR § 4209.20(d), (e). That audit report contains findings of fact, conclusions of law, and recommendations. *Id.* The RA then serves the audit report on the tenants, and, from that point, the tenants have thirty days to file written exceptions and/or objections to the audit report. 14 DCMR § 4209.20(f)(1). If tenants do file exceptions or objections, the RA must conduct a hearing. 14 DCMR § 4209.20(f)(3).

The RA "shall issue and publish a final decision within 90 days after the petition has been filed." D.C.Code § 42–3502.12(c). When the RA fails to issue a

---

* Judge Kramer was an Associate Judge of the court at the time of oral argument. Her status changed to Associate Judge, Retired on May 1, 2011.

1. Our decision in *Drayton v. Poretsky Mgmt., Inc.*, 462 A.2d 1115 (D.C.1983), provides that " 'when there is pending before the [Rent] Administrator or the RHC (Rental Housing Commission) a challenge to a rent increase that bears upon the amount of rent owed by a tenant defending a possessory action brought for nonpayment of rent, the L & T Judge should stay the action to await the ruling of the Administrator or, if an appeal is taken to the RHC, then of that body.' " *Mullin v. N Street Follies Ltd. P'ship*, 712 A.2d 487, 492 (D.C.1998) (quoting *Drayton, supra*, 462 A.2d at 1120).

2. *See generally, Bell v. Tsintolas Realty Co.*, 139 U.S.App. D.C. 101, 430 F.2d 474 (1970). *Bell* was the first case to hold that protective orders may be issued in the landlord-tenant context. Hearings to determine whether a protective order should be issued and in what amount are referred to as *Bell* hearings.

final decision within that time, the statute permits the landlord to conditionally implement the rent increase sought, an increase subject to subsequent modification by the RA's final order taking account of the tenants' exceptions. *Id.*

On April 29, 2009, Lanier filed a hardship petition with the RA asking permission to increase the rental rates of the units in Graham's building. Lanier claimed that it needed to raise rents by 225% to achieve the 12% statutory return. When the RA failed to take action on the petition within the 90–day window, Lanier gave notice to the tenants that it would conditionally increase the rent effective January 1, 2010. Lanier notified Graham, in particular, that her monthly rent would increase from $917 to $2000, an increase of 118%.[3] The rent increase went into effect January 1, 2010, but Graham continued to pay only $917, the cost of her rent before the conditional increase.

## B. *The Action for Nonpayment of Rent*

On March 23, 2010, Lanier filed a complaint against Graham for possession of her rental unit, claiming nonpayment of rent and seeking rent past-due for the difference between the $917 per month Graham had been paying and the $2000 per month Lanier was charging pursuant to the conditional increase. On March 29, the RA completed the first step of the hardship petition process and issued its audit report, determining that Lanier, to achieve the permitted statutory rate of return, was entitled to raise the rent by 110.17%. On April 19, within the time frame allotted, Graham filed exceptions and objections to the hardship petition, claiming that Lanier's documentation supporting the petition was flawed and that substantial housing code violations existed

in the building. The next day, she filed a motion to stay the possession proceedings in landlord-tenant court. The trial court granted the motion for a *Drayton* stay, and held a *Bell* hearing to determine whether Lanier was entitled to a protective order, and in what amount, for the duration of the administrative proceedings.

## C. *The Bell Hearing*

In response to Lanier's request for a protective order of $1,890, reflecting the 110% increase provisionally approved by the RA, Graham argued that a protective order, if any, should not exceed the $917 undisputed rent she had been paying. Both parties presented evidence at the *Bell* hearing. Graham testified on her own behalf, and Arnold Litman, Lanier's agent, testified for appellee. Graham insisted that there were housing code violations in her unit and provided confirmatory photographic evidence. She further testified that her monthly income was only $2,036 and that, at most, she could afford to pay $1,150 per month; a rent above that would force her to find new housing.

Lanier, through Litman, did not dispute this testimony that any protective order over $1,150 per month would effectively force Graham out of the housing unit. Instead, Litman described the efforts Lanier has made to rectify code violations that had stood in the way of past rent increases. It was conceded that Graham's rent had not been increased in ten years as a result of disputes over the existence of those violations.

In deciding what protective amount to set, Judge Richter recognized that if he set the amount too low and Lanier were to prevail in the administrative proceeding, it would be "an injustice to [Lanier] if [Gra-

---

**3.** It was not disclosed why Lanier chose to increase Graham's rent by 118% rather than the full 225% it requested in the hardship petition.

ham has] been paying less than the full amount." On the other hand, he noted that "[i]f [Graham] wins in front of the Rental Administrator and has gotten thrown out in the interim, it would be a grave injustice to her." In ultimately setting the protective amount at $1,500 a month, the judge credited and gave weight to Litman's testimony about the remediation of past code violations, but gave less weight to Graham's testimony—unchallenged—that more than a modest rent increase would effectively mean her eviction. He explained: "I believe that if Ms. Graham wishes to stay that's an amount that she should be able to make, and even if she can't that would be a fair amount to protect the plaintiff. It's sort of hard for me to believe that [the agency is] not going to approve an increase after there's been no increase in 10 years, particularly when there's been efforts to rectify the problems."

## II.  Analysis

■ Whether to issue a protective order and the amount of a protective order—an equitable remedy that has become commonplace in landlord-tenant court, *Mahdi v. Poretsky Mgmt., Inc.*, 433 A.2d 1085, 1086 (D.C.1981) (per curiam)—is within the discretion of the trial court. *See Mullin, supra* note 1, 712 A.2d at 489, 494. We review the trial court's decision for abuse of that discretion. *See Lindsey v. Prillman,* 921 A.2d 782, 785 (D.C.2007) (citing *Akassy v. William Penn Apartments Ltd. P'ship,* 891 A.2d 291, 308 (D.C. 2006)). In general, the purpose of a protective order in the landlord-tenant context is to maintain the status quo between the parties. *See Davis v. Rental Assocs., Inc.,* 456 A.2d 820, 824 (D.C.1983) (en banc) ("[A] protective order has no permanent impact on the rights of the parties but only maintains the status quo between the landlord and tenant."). " 'The guiding princi-

ple for the court is … to arrive at a reasonable monthly payment which will, at one and the same time, impose a fair obligation on the defendant, permit the case to be heard on the ·merits, and assure the plaintiff that if he wins, he will … at least receive reasonable intervening rent.' " *Id.* at 825 (quoting *Thompson v. Mazo,* 137 U.S.App. D.C. 221, 226–27, 421 F.2d 1156, 1161–62 (1970)).

### A.

■ Citing in particular the statement in *Bell, supra* note 2, that "only when the landlord has demonstrated obvious need" for a protective order may the court impose that interim obligation on a tenant, *see* 139 U.S.App. D.C. at 110–11, 430 F.2d at 483–84, Graham and *amicus curiae* argue that no protective order, and certainly none above the $917 in rent Graham had been paying, was proper because Lanier failed to demonstrate "obvious need" for a protective order. The manner in which they define "need," however, as a prerequisite to any protective order above the present rent is, we think, inconsistent with our decisions and takes inadequate account of the statutory hardship petition scheme.

*Amicus,* for example, would require the landlord to show a significant "risk of foreclosure," the inability to make "needed repairs," or a need to "charg[e] more rent to other tenants to meet the property's operating expenses" before any protective order may be imposed. Graham similarly would require the judge, before issuing a protective order, to assess the "objective reality of the landlord's purported need," measured, for example, by the "the threat of foreclosure" otherwise, the number of months the tenant has "failed to make even a partial rental payment, the amount of allegedly unpaid rent, or the reasonable value of the premises." A narrow focus, however, on whether the landlord would

risk foreclosure or a net operating loss without a protective order ignores the injunction of our cases that the protective order determination must consider "all relevant factors," *Akassy, supra*, 891 A.2d at 308–09; *see also Stets v. Featherstone*, 754 A.2d 292, 296–97 (D.C.2000), an approach incompatible with any presumption that the existing rent provides the measure of a just protective order. *See Akassy*, 891 A.2d at 308 (declining "to adopt a rigid rule that would limit the protective order amount to the undisputed amount of the rent."). Moreover, even on Graham's own terms, it is clear to us that the trial judge looked to the "objective reality" of the landlord's need by noting that she had not received an increase in her rent for ten years and that corrective steps regarding her housing unit had made the justification for this effective rent freeze on the unit less defensible than in the past.

Also favoring the judge's decision to set an amount above the rent currently paid is the statutory background of the hardship petition process against which the protective order inquiry arose, in particular the feature of the legislative scheme permitting the landlord a 12% rate of return on investment. D.C.Code § 42–3502.12(a). Lanier's hardship petition had undergone the first-stage review by the RA, who found after an audit that Lanier was not earning its statutory return on the property and by how much—an initial determination, in short, of the landlord's "need" for a rent increase, and one to which Judge Richter could properly give some weight. Graham and *amicus* disagree, basically viewing this audit as irrelevant to the protective order question because the RA had not proceeded to, or completed, the critical

second step of the review process that considers tenants' objections. Citing *Mullin*, they argue that no protective order over the undisputed rent amount should be entered unless, and to the extent that, the RA has approved the hardship petition over tenant exceptions. *See Mullin, supra* note 1, 712 A.2d at 494 (finding no abuse of discretion in changing protective order to include increased rent amount "in recognition of the increased likelihood, given the [RA's] decision, that the landlord's hardship petition would be approved [on appeal to the Rental Housing Commission]"). We do not read *Mullin* that narrowly, because our decisions in general do not bar the trial court, in setting a protective payment amount, from making its own predictive judgment as to the likely success of the hardship petition based on testimony before it about, among other things, alleged housing code violations and corrective measures. *See, e.g., Stets*, 754 A.2d at 296–97 (trial court failed "to inquire into . . . the merits," *inter alia*, "of the tenant's claims of rent ceiling and housing code violations" before ruling on protective order request). *Mullin* certainly confirms that the further along in the administrative process a hardship petition has progressed, the more weight the trial court may give to a protective order request including a rent increase; but it does not preclude the court from weighing landlord entitlement—confirmed provisionally by the RA's audit—against a predictive assessment of the strength of the tenant's objections to a rent increase.[4] To that extent, Judge Richter's balancing of the equities was proper and commendable, in an area where, as he observed, there is no "scientific method [by which] to arrive at [a just] figure."

4. Indeed, precluding any assessment by the court of the likely outcome of the tenant's administrative challenge is hard to reconcile with § 42–3502.12(c), which allows the landlord to conditionally impose the requested rent increase if the RA has not completed action on the petition in ninety days.

## B.

On the other hand, we agree with Graham and *amicus* that the judge passed too lightly over Graham's testimony, unchallenged, about the limits of the rent she could pay without having to move. The *Bell* decision, which is binding on us, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), counsels against setting a protective order—an interim measure designed to guard the status quo—so high as to risk depriving the tenant of her opportunity to present meritorious defenses to a landlord's possessory action. *See Bell, supra* note 2, 139 U.S.App. D.C. at 107, 430 F.2d at 480 ("All courts must be careful lest the financial burdens of litigation preclude the poor from litigating meritorious issues."); *McQueen, supra*, 547 A.2d at 178 (setting protective order amount too high may deprive tenant "of his or her otherwise meritorious defenses to the landlord's suit"). Thus, the balance must be struck carefully, mindful of the fact that "actual eviction from [the tenant's] home for what may be [later] determined to be illegal charges is essentially irreparable." *Akassy, supra*, 891 A.2d at 306.

Despite Graham's testimony about her limited income and inability to pay more than $1,150 a month, the judge determined that $1,500 was "an amount that she should be able to make" if she "wishes to stay." Whether that revealed skepticism by the judge about the professed limits of her income or was instead, as Graham suggests, an arbitrary figure chosen somewhere between the parties' competing submissions of the proper amount, we cannot say. But neither on cross-examination nor in any other manner did Lanier give the judge reason to doubt Graham's sincerity, and particularly where, as here, the landlord has shown no exigency in the need for the petitioned rent increase, undisputed evidence of a tenant's financial straits may not be ignored in favor of a rough approximation of—a splitting the difference as to—an equitable protective amount.

Accordingly, we order the amount of the protective order to be reduced to $1,150 per month, $917 of which is to be paid to Lanier directly and the rest into the court registry. That accords with the interim amount a motions panel of this court directed, and is within our authority to "direct the entry of such appropriate order ... as is just in the circumstances." D.C.Code § 17–306 (2001). A remand instead for a further exercise of its discretion by the trial court would, we think, be a waste of judicial resources on what, after all, is an interim and subordinate matter in the larger resolution of this case.

*So ordered.*