*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-540

GARDENIA BROWN, APPELLANT,

V.

ROY L. PEARSON, JR., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(LTB-11162-14)

(Hon. Curtis E. von Kann, Trial Judge)

(Argued November 26, 2019                    Decided April 2, 2020)

*Dorene Haney* for appellant.

Roy L. Pearson, Jr., *pro se*.

Before GLICKMAN and THOMPSON, *Associate Judges*, and STEADMAN, *Senior Judge*.

GLICKMAN, *Associate Judge*: This appeal is from the Superior Court's suspension of a protective order requiring a tenant to make rent payments into the registry of the court pending the outcome of the landlord's indefinitely stayed action for possession. The dispute has a long and complicated history that bears on the issues before us.

Appellee Roy Pearson, Jr., has been a tenant of appellant Gardenia Brown since 1999. In the ensuing years, Ms. Brown raised Mr. Pearson's rent a number of times, relying on the claim she filed in 1997 for exemption as a small landlord from the District's rent stabilization program. However, Ms. Brown did not provide Mr. Pearson with a copy of her exemption at the inception of his tenancy or for many years thereafter. The Rental Housing Act of 1985[1] and its implementing regulations required her to do so.[2] In 2014, based on this omission, Mr. Pearson filed the first of four tenant petitions in the Rental Accommodations Division (RAD) of the Department of Housing and Community Development against Ms. Brown for unlawful rent overcharges. Also in 2014, Ms. Brown filed the present action for possession in Superior Court based on Mr. Pearson's withholding of rent and on her intent to occupy the rented premises herself. The court stayed the action pending the outcome of the administrative process.[3] That process is still going on, and the stay remains in effect.

---

[1] D.C. Law 6-10, § 205(a)(3)(C) (July 17, 1985) (codified at D.C. Code § 42-3502.05(d) (2019 Supp.)).

[2] 14 DCMR § 4101.6 (2019).

[3] *See Drayton v. Poretsky Management, Inc.* 462 A.2d 1115, 1120 (D.C. 1983) (holding that "[a]pplication of the doctrine of primary jurisdiction requires"

(…continued)

In addition to entering a stay, the court entered a protective order requiring Mr. Pearson to pay the amount of his rent, $1,320 each month, into the court's registry pending the outcome of the case. As of early 2018, Mr. Pearson had paid over $59,000 in compliance with the protective order. Meanwhile, an administrative law judge (ALJ) rendered two rent overcharge awards to Mr. Pearson, for $9,706.72 and $11,941.47, representing roughly sixteen months' rent in total, due to Ms. Brown's failure to inform Mr. Pearson of her small landlord exemption. Mr. Pearson appealed both awards as inadequate. The Rental Housing Commission (RHC) affirmed the first award but has yet to render a decision on the second.

In February 2018, Mr. Pearson told Ms. Brown he would not make protective order payments until she paid him what she owed him. When Mr. Pearson then withheld his March 2018 payment, Ms. Brown moved for sanctions for his violation of the protective order. With the consent of the parties, the court released funds from the court registry to pay Mr. Pearson the amount of the first award. In April, the court denied Ms. Brown's motion for sanctions and, in doing so, suspended the

_____

(…continued)
the trial court to stay a landlord's action for possession for nonpayment of rent "when there is pending before the [Rent] Administrator or the [Rental Housing Commission] a challenge to a rent increase that bears upon the amount of rent owed by a tenant defending [the] possessory action" until there is final agency action on the matter).

protective order until such time as she paid Mr. Pearson the second award. The court denied Ms. Brown's motion to pay him that award from the protective order funds that had accumulated in the registry. Mr. Pearson has continued living in the rented premises without paying anything into the court's registry, or to Ms. Brown, since March 2018 (as of now, a period of roughly 24 months).

Ms. Brown has appealed the indefinite suspension of Mr. Pearson's protective order payments, and we vacate the suspension and remand. Although the suspension is not a final order – in that it did not terminate the litigation, which continues to be stayed due to the remaining RHC proceedings – we conclude that we have jurisdiction to entertain the appeal under the test adopted by the Supreme Court in *Carson v. American Brands, Inc.*,[4] which this court has followed and applied in the landlord/tenant context. Ms. Brown's appeal satisfies that test because the protective order has the "practical effect" of an injunction, and – in the unusual circumstances of this case – its continued indefinite suspension threatens to cause Ms. Brown "serious, perhaps irreparable, consequences" that "can be effectually challenged

---

[4] 450 U.S. 79 (1981).

only by immediate appeal."[5]  As to the merits, we agree with Ms. Brown that the indefinite suspension of the protective order was an abuse of the court's discretion.

## I.

In 1987, Ms. Brown purchased a condominium located at 3012 Pineview Court, N.E.  This was (and apparently has remained) her only rental unit in the District of Columbia, and in January 1997, she filed a claim of exemption as a small landlord from the District's rent stabilization program.[6]  In October 1999, Ms. Brown leased the condominium to Mr. Pearson.  At that time, she neglected to provide him with a copy of her small landlord exemption claim, which the rental housing regulations required her to do.[7]  She relied on her exemption, however, in raising Mr. Pearson's rent at various times during his tenancy.

---

[5] *Id.* at 84 (internal quotation marks omitted).

[6] D.C. Code § 42-3502.05(a)(3) (small landlord exemption).

[7] *Id.* § 42-3502.05(d); 14 DCMR § 4101.6.  Ms. Brown also did not give Mr. Pearson a copy of a new claim of exemption she filed, allegedly at his behest, in 2010.

In January 2013, Ms. Brown decided to increase Mr. Pearson's rent from $1,004 to $1,320. She informed Mr. Pearson of the increase five days after they had argued about the adequacy of heating and heating repairs in the condominium. In an email, he accused her of violating the Rental Housing Act by retaliating against him for asserting his right to adequate heating and by not providing him with a copy of her claim of exemption at the inception of his tenancy. Thereafter, Mr. Pearson paid the increased rent of $1,320 under protest. In December, Ms. Brown notified him of another rent increase, to take effect on March 1, 2014, from $1,320 to $1,386 per month.

On February 12, 2014, Mr. Pearson filed a tenant petition with the RAD against Ms. Brown complaining that his rent had been increased unlawfully. The following week, Ms. Brown filed and served on Mr. Pearson a notice to vacate the rental premises by May 15, 2014, so that she could have it for her personal use and occupancy.[8] Mr. Pearson then withheld his March, April, and May rent, prompting

---

[8] Ms. Brown has asserted that she was planning for her retirement by downsizing, selling the larger house in which she lived, and moving into the condominium she leased to Mr. Pearson. Her notice to him was defective, however, because it gave him a few days less than a full 90 days from the date it was served on him to vacate.

Ms. Brown to file a complaint in Superior Court for possession of her condominium for failure to pay rent and failure to vacate for personal use and occupancy.

On May 23, 2014, the court entered a *Drayton* stay pending the administrative determination of Mr. Pearson's tenant petition, along with a protective order requiring him to pay $1,320 a month into the court's registry until the resolution of Ms. Brown's complaint for possession.

Since then, almost six years have elapsed, the stay of the Superior Court proceedings has yet to be lifted, and the litigation between Mr. Pearson and Ms. Brown has expanded and become more complicated. In July 2014, Mr. Pearson filed a second tenant petition, in which he challenged the notice to vacate for personal use and occupancy. This petition was consolidated with the first petition. Ms. Brown then voluntarily dismissed her complaint for possession for failure to vacate for personal use and occupancy (but not for failure to pay rent) and served Mr. Pearson with another notice to vacate for personal use and occupancy. He did not vacate and, instead, filed a third tenant petition eight months later, in May 2015, challenging the notice. He filed a fourth tenant petition in July 2016, alleging that all actions Ms. Brown had taken against him were retaliatory. Mr. Pearson later amended his

petitions with a claim to recover the amount of unlawful rent increases he paid into the court's registry after October 2014 pursuant to the protective order.

The ALJ originally assigned to hear Mr. Pearson's tenant petitions left the Office of Administrative Hearings sometime in 2015, delaying decision on the petitions until the case was reassigned to another ALJ about a year later. In December 2016, that ALJ ruled partly in Mr. Pearson's favor on his first set of tenant petitions and awarded him $9,706.72 for rent increases (including interest) from February 2011 (three years prior to the filing of the tenant petition)[9] to March 2014 (the date of the hearing). Mr. Pearson appealed this ruling to the RHC, claiming he was entitled to recover for all of the rent increases dating back to 1999 (despite the three-year statute of limitations) and to treble damages because Ms. Brown's violations allegedly had been willful. On July 25, 2017, the ALJ awarded Mr. Pearson an additional $11,941.47 for subsequent rent increases (including interest) from November 2014 through December 2016; but he found that Ms. Brown had

---

[9]  D.C. Code § 42-3502.06(e) (2019 Supp.) forbids claims for any rent adjustment filed "more than 3 years after the *effective date* of the adjustment" (emphasis added). Mr. Pearson argued to the ALJ and in the RHC that, because Ms. Brown did not properly register as exempt from rent control, there was no "effective date" for the statute of limitations to apply, as all rents Ms. Brown charged above the legal rent level were unlawful and thus not "effective." The ALJ rejected Mr. Pearson's argument as "tautological" and "unreasonable," and the RHC affirmed that decision.

properly registered her property as exempt from the rent control law as of October 31, 2016, so that Mr. Pearson's legal rent was $1,386 as of January 1, 2017. Mr. Pearson appealed that ruling too. On May 3, 2018, the RHC rendered a decision in the first appeal. It affirmed most of the ALJ's rulings but remanded the case for more specific findings as to whether Ms. Brown had violated the law willfully. On remand, the ALJ found she had not. Mr. Pearson appealed that ruling.

To date, the RHC has not rendered a decision on Mr. Pearson's second and third appeals. Both parties agreed at oral argument before us that it is highly likely this court will be asked to review any decision by the RHC, and that there is no telling when this case will end.

The protective order entered by the Superior Court in May 2014 ensured that neither Ms. Brown nor Mr. Pearson would be placed at a severe disadvantage by the long delay. At the end of the day, the funds accumulated in the registry would be available for Ms. Brown to receive the rent to which she was entitled and for Mr. Pearson to recover whatever setoff was due to him. Mr. Pearson would not be evicted for nonpayment of rent. And both parties were protected from the possibility that, after years of litigation, Mr. Pearson would be in significant arrears and faced with an enormous debt that he would be unable to pay and Ms. Brown would be

unable to collect.  As the parties' disputes dragged on, the protective order remained in effect for almost four years.

But on April 18, 2018, the court suspended the protective order indefinitely. That decision came about after Mr. Pearson refused to make his March 2018 protective order payment into the registry of the court until Ms. Brown paid him the amounts awarded to him in connection with his tenant petitions.[10]  Up to that point, Mr. Pearson had made all of his protective order payments, which by then came to $59,400 sitting in the court's registry.  Ms. Brown, who had yet to receive any of that rent money, responded to his refusal to continue making payments by moving for sanctions and asking that the court strike Mr. Pearson's pleadings and hold a hearing to enter a redeemable judgment of possession in her favor.  In his opposition to that motion, Mr. Pearson asked the court to dismiss the action and order the return to him of all the funds in the registry, or else to vacate the protective order or allow him to credit what Ms. Brown owed him against his payments under it.

---

[10]  It appears that Mr. Pearson was under financial stress at this time because his unemployment compensation had run out and he was incurring increasing indebtedness.  Previously, in January and October 2017, the Superior Court had denied motions by Mr. Pearson to release funds from the court's registry and to suspend the protective order for two months.

At a hearing on the motion for sanctions on March 19, Ms. Brown and Mr. Pearson agreed that $9,706.72 (the amount of Mr. Pearson's first award) could be released to Mr. Pearson from the registry so that he could resume making the monthly payments required by the protective order. The court entered a consent order providing for that relief and decided to pass the case until April 18, 2018, when it would take up Ms. Brown's motion for sanctions and other remaining matters. Before the parties departed, Mr. Pearson submitted an application to proceed *in forma pauperis*. In lieu of considering that application at the time, the court *sua sponte* suspended the protective order – even though it had just entered an order releasing funds from the court's registry so that Mr. Pearson could make his protective order payments – until the April 18 hearing.

On April 18, 2018, the court, without hearing additional argument, denied Ms. Brown's motion for sanctions; suspended the protective order until Ms. Brown paid Mr. Pearson the amount of his second RHC award; denied Mr. Pearson's requests to dismiss the action and for a return of all the funds he had deposited in the court's registry; and denied Mr. Pearson's application to proceed *in forma pauperis*. Ms. Brown then moved for the release of funds from the court's registry to satisfy the second award, but the court denied that motion.

Ms. Brown appealed the decision suspending the protective order.

## II.

Conceived as being within the trial court's "equitable jurisdiction"[11] in landlord-tenant matters, and now recognized in Superior Court Landlord and Tenant Rule 12-I, a protective order directing the tenant to deposit money into the court registry in lieu of paying rent directly to the landlord is a *pendente lite* order, "not a determination of the merits of a case."[12] It is designed "to maintain the status quo between the parties"[13] and ensure that the landlord will not be "exposed to a prolonged period of litigation without rental income."[14]

---

[11] *Bell v. Tsintolas Realty Co.*, 430 F.2d 474, 479 (D.C. Cir. 1970).

[12] *Mullin v. N St. Follies Ltd. P'ship*, 712 A.2d 487, 493 (D.C. 1998) (quoting *R & A, Inc. v. Kozy Korner, Inc.*, 672 A.2d 1062, 1071 (D.C. 1996)).

[13] *Graham v. Lanier Assocs.*, 19 A.3d 361, 365 (D.C. 2011).

[14] *Davis v. Rental Assocs., Inc.*, 456 A.2d 820, 823 (D.C. 1983) (en banc) (plurality opinion) (quoting *Bell*, 430 F.2d at 482).

Ms. Brown argues that the court abused its equitable discretion by suspending the protective order indefinitely. Mr. Pearson disagrees, and he argues that we do not have jurisdiction over this appeal because the suspension of the protective order was neither a final order terminating the action nor equivalent to an interlocutory order dissolving or modifying an injunction. We address the jurisdictional question first, and then proceed to consider whether the court abused its discretion.

**A.**

The District of Columbia Court Reorganization Act of 1970[15] grants this court appellate jurisdiction over "interlocutory orders of the Superior Court . . . granting, continuing, modifying, refusing, or dissolving or refusing to dissolve or modify injunctions."[16] Because a protective order is a *pendente lite* order, we focus on that grant of jurisdiction, which is codified under D.C. Code § 11-721(a)(2)(A).

---

[15] *See* Pub. L. No. 91-358, Title I, 84 Stat. 473 (1970).

[16] D.C. Code § 11-721(a)(2)(A) (2012 Repl.).

Section 11-721(a)(2)(A)'s "federal analogue" is 28 U.S.C. § 1292(a)(1).[17] Accordingly, we have looked to federal cases interpreting that statute for guidance in construing § 11-721(a)(2)(A) and, in doing so, we have adopted the "practical effect" test originally articulated by the Supreme Court in *Carson*.[18] In *Carson*, the Court held that an order, though not "in terms" an injunction, is appealable like an injunction under § 1292(a)(1) if it (1) has the "practical effect" of an injunction, and (2) will cause "serious, perhaps irreparable, consequence" to the appealing party that "can be effectually challenged only by immediate appeal."[19]

Applying *Carson*'s two-prong test, this court in *McQueen* upheld our jurisdiction over an appeal by tenants of a protective order directing them to pay rent into the court's registry pending the outcome of the case.[20] A protective order, we said, "has the 'practical effect' of an injunction" because "it enjoins the tenant to pay a specified amount in lieu of rent, at given intervals, in a particular manner (generally, into the registry of the court)" and "limits the tenant's ability to engage

---

[17] *McQueen v. Lustine Realty Co.*, 547 A.2d 172, 176 (D.C. 1988) (en banc).

[18] *See Brandon v. Hines*, 439 A.2d 496, 500, 505-09 (D.C. 1981).

[19] 450 U.S. at 84 (internal quotation marks omitted).

[20] *McQueen*, 547 A.2d at 174.

in a rent strike or similar self-help remedy to obtain relief from the landlord."[21] And we recognized that an unreasonable protective order could have serious, perhaps irreparable, consequences for a tenant because "the normal sanction for failure to comply with a protective order is to strike the tenant's pleadings."[22] "The ultimate consequence, of course, is that a tenant may lose possession of the rental property notwithstanding [his or her] defenses, simply because the trial court has entered an unreasonable protective order with which the tenant could not comply."[23] Nor could "an erroneous protective order generally . . . be 'effectually challenged' on appeal of the merits of the possession action," because after a tenant "lose[s] possession of the property, 'one could hardly vouch for the likelihood that the occupancy would be resumed even in the event of an ultimate merits victory.'"[24] We also held in *McQueen* that tenants *in every case* may appeal unreasonable protective orders, even though some tenants might possess "adequate resources that would render the consequence of an erroneous protective order less than 'serious,' let alone

---

[21] *Id.* at 176.

[22] *Id.* at 178.

[23] *Id.*

[24] *Id.* (quoting *Cooks v. Fowler*, 437 F.2d 669, 672 n.7 (D.C. Cir. 1970)).

'irreparable.'"[25]  We justified that holding because "our experience in reviewing landlord and tenant cases" led us to believe "that, in the typical landlord's action for summary possession in Superior Court, a 'serious, perhaps irreparable consequence' will almost always be threatened when the tenant is subject to a protective order."[26]

In *B.F. Saul Co. v. Tiefenbacher*,[27] we considered whether *landlords* could appeal interlocutory orders denying motions to release funds paid by tenants into the court's registry pursuant to protective orders.[28]  We declined to extend our holding in *McQueen* to allow landlords in every case to take such appeals; there was no showing, we said, that the refusal to release registry funds would impose consequences on "landlords, *as a class*," similar to those we observed in *McQueen* for tenants facing unreasonable protective orders.[29]  The landlord in any appeal therefore must individually "satisfy the two-prong test, as enunciated in *Carson* and

---

[25] *Id.* at 179 (quoting *Carson*, 450 U.S. at 84).

[26] *Id.*

[27] 28 A.3d 1115 (D.C. 2011).

[28] *Id.* at 1118.

[29] *Id.*

applied in . . . *McQueen*."[30]  Writing separately, Judge Oberly emphasized that our decision in *B.F. Saul Co.* did not mean that an "*individual landlord*" could *never* meet *Carson*'s two-prong test.[31]  Judge Oberly observed that "the pendency of unresolved administrative action" – particularly over five years of delay, as was the case in *B.F. Saul Co.* – may impose serious, perhaps irreparable, consequences on the landlord by threatening his "statutory entitlement to a maximum 12% rate of return on investment," due in part to "a swamped and perhaps bureaucratic administration."[32]  In other cases, this court has entertained individual appeals by landlords from orders entering[33] or denying[34] protective orders, albeit without addressing the applicability of *Carson*'s two-prong test or whether the landlord would suffer irreparable harm as we required in *B.F. Saul Co.*

We conclude that Ms. Brown's appeal satisfies *Carson*'s two-prong test.  The first prong is satisfied because the appeal is from a decision indefinitely denying Ms.

---

[30]  *Id.* We declined to address whether the particular landlord "c[ould] satisfy the stringent requirements of *Carson* and *McQueen* as an individual" because it was "an issue for another case, on another appeal, on another day." *Id.* at 1118-19.

[31]  *Id.* at 1119 (Oberly, J., concurring) (emphasis added).

[32]  *Id.* (citing D.C. Code § 42-3502.12(a) (2001)).

[33]  *LaPrade v. Liebler*, 614 A.2d 546, 547 n.4 (D.C. 1992).

[34]  *Lindsey v. Prillman*, 921 A.2d 782, 784 n.1 (D.C. 2007).

Brown the benefit of a protective order previously granted to her, and we have held that a protective order has the practical effect of an injunction. Under § 11-721(a)(2)(A), a decision denying, dissolving, or modifying an injunction is interlocutorily appealable just like a decision granting an injunction.

The second prong of *Carson* – that the court's ruling will cause serious and perhaps irreparable injury to Ms. Brown that can be challenged effectually only by an immediate appeal – is also met. We must view the indefinite suspension of the protective order in conjunction with the court's refusal to release funds from the registry to pay Mr. Pearson's award and in light of the practical realities of the litigation between the parties. Ms. Brown is a small landlord who has received no income at all from her sole rental property for six years now, and there is no end in sight to this litigation. The protective order provided her only assurance of ever receiving rent from Mr. Pearson, who professes to be indigent and is continuing to reside in the premises. The indefinite suspension of that order threatens to deprive Ms. Brown permanently of any rental income from her property for the entire duration of the suspension, which may last years, and of her own use of that property for the same time period. The dollar amount of that deprivation already greatly exceeds, and if continued will be totally disproportionate to, the amount that Mr.

Pearson has been awarded on his tenant petitions.[35]  And given Mr. Pearson's indigency, if he is not required to resume making monthly payments into the court's registry, the likelihood that he will be able to make them up at some future point (after a credit for any amounts awarded on his tenant petitions) appears purely hypothetical.[36]  Thus, there is every reason to conclude that the on-going and ever-

---

[35] Nor do we have reason to assume that Mr. Pearson will receive a substantial additional award in the matters he still has pending before the RHC.  To the extent he claims a likelihood of success based on his claims that Ms. Brown's violations were willful and that the statute of limitations does not apply to his claim of rent overcharges, we note that the ALJ rejected the former claim on remand from the RHC and the RHC rejected the latter one in resolving Mr. Pearson's first appeal.  *Cf. Dameron v. Capitol House Assocs. Ltd. P'ship*, 431 A.2d 580, 584 n.6 (D.C. 1981) ("When determining the appealability of orders which potentially threaten irreparable harm, courts must often examine the merits of the underlying claim."), *overturned on other grounds by McQueen*, 547 A.2d 172.

[36] Although Ms. Brown theoretically could maintain a damages action against Mr. Pearson in the future, Mr. Pearson's representations of his own financial situation lead us to believe he is possibly insolvent and will be unable to satisfy a future judgment, supporting our conclusion that she will suffer irreparable harm if denied injunctive (or quasi-injunctive) relief.  *See, e.g.*, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) ("[T]here were allegations that Independence was insolvent and its assets in danger of dissipation or depletion.  This being so, the legal remedy against Independence, without recourse to the fund in the hands of Pennsylvania, would be inadequate."); *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) ("[W]e have held that a finding of irreparable harm may lie in connection with an action for money damages where the claim involves an obligation owed by an insolvent or a party on the brink of insolvency." (citing *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999))); *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th

(…continued)

increasing injury to Ms. Brown occasioned by the suspension is reparable either now or never. Waiting would be virtually equivalent to confiscation of her property.[37]

In these circumstances, we conclude that we have jurisdiction over this landlord's interlocutory appeal of the indefinite suspension of a protective order.

**B.**

---

(…continued)
Cir. 1994) ("[E]ven where a harm could be remedied by money damages at judgment, irreparable harm may still exist where the moving party's business cannot survive absent a preliminary injunction or where '[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.'" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984))); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990) ("[T]he unsatisfiability of a money judgment can constitute irreparable injury . . . .").

[37] *See Davis*, 456 A.2d at 827 (plurality opinion) ("[I]n determining whether a tenant should be permitted to make a late payment or a partial payment, the trial court must recall 'that the Constitution expressly protects against confiscation of private property or the income therefrom.'" (quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972))); *Mahdi v. Poretsky Mgmt., Inc.*, 433 A.2d 1085, 1089 (D.C. 1981) ("Turning first to Landlord, the effect on his position of not striking Tenant's pleadings has previously been discussed. If this litigation is permitted to continue with no funds in the registry and with Tenant on the premises, Landlord will not be in a position to rent the unit to a paying tenant. He will continue to be deprived of funds which he may well need to pay his mortgage, to maintain other tenants' apartments, and for other appropriate purposes. Such deprivation might well constitute the kind of confiscation against which the Court warned in *Lindsey* . . . ." (quoting *Arthur E. Morrisette Real Estate v. Hunt*, 109 Daily Wash. L. Rptr. 901 (D.C. Super. Ct. April 8, 1981))).

We now turn to the merits. As we have said, a protective order is an equitable remedy designed "to maintain the status quo between the parties."[38] Although this remedy "has become commonplace in landlord-tenant court," it lies within the discretion of that court to decide whether to issue one and at what amount.[39] Accordingly, we review the court's decision in this case to suspend the protective order for abuse of discretion.[40]

Ms. Brown argues that the court abused its discretion by suspending the protective order because doing so undermined the important purposes of the remedy; imposed a burden on her to come up with fresh funds for Mr. Pearson in an already unstable situation; allows Mr. Pearson to live in her property rent-free indefinitely; and created the severely inequitable result we have just described in the preceding section of this opinion. We are constrained to agree.

The suspension appears in unjustified conflict with the fundamental import of our case law concerning the protective order remedy. In fashioning an appropriate

---

[38] *Graham*, 19 A.3d at 365.

[39] *Id.*

[40] *Id.*

protective order, a court should consider the interests of both the landlord and the tenant and strive "to balance the equities and to accommodate the competing considerations inherent in landlord-tenant controversies."[41] The "guiding principle," we have said, is "to arrive at a reasonable monthly payment which will . . . impose a fair obligation on the [tenant], permit the case to be heard on the merits, and assure the [landlord] that if he wins he will, having been denied interim possession, at least receive reasonable intervening rent."[42] In fulfilling that obligation, the court should consider "all relevant factors,"[43] not only factors favorable to one side.

It appears to us, however, that the court's consideration in the present case was unduly narrow. The court clearly considered that Ms. Brown owed Mr. Pearson a certain sum of money for rent overcharges and that Mr. Pearson could not afford to make protective order payments if she did not pay that debt to him. However, the court appears not to have considered (or, at least, not to have explained its rejection

---

[41] *Mahdi*, 433 A.2d at 1090.

[42] *Davis*, 456 A.2d at 825 (plurality opinion) (quoting *Thompson v. Mazo*, 421 F.2d 1156, 1161 (D.C. Cir. 1970)).

[43] *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 309 (D.C. 2006); *accord Graham*, 19 A.3d at 366.

of) more commensurate and less onerous alternatives to indefinitely suspending the protective order – including alternatives the parties themselves proposed. Those alternatives included releasing the amount of funds from the registry needed to pay Mr. Pearson or crediting Ms. Brown's debt against his payment obligations on a monthly basis for the limited time necessary (approximately nine months) to discharge her debt. The unexplained failure to employ those or similar alternatives resulted, apparently, in an unnecessary over-compensation of Mr. Pearson, in that he was excused from making otherwise mandatory payments into the registry in an amount that greatly exceeded what Ms. Brown owed him. The judge may well have thought that Ms. Brown would immediately satisfy the debt and that the protective order would then resume. But there is nothing in the record to support that assumption; Ms. Brown is a small landlord; and the funds deposited in the registry pursuant to the protective order were more than sufficient to satisfy the award.

Nor does it appear that the court gave adequate consideration to the need for a protective order in the circumstances of this case. The order was entered to remediate, to some extent, Ms. Brown's "expos[ure] to a prolonged period of litigation without rental income," so as to avoid placing her "at a severe disadvantage

during the period of litigation."[44] The order also served to "protect [Mr. Pearson's] ability to satisfy his housing needs, in that such payments prevent[ed] [him] from falling further in arrears."[45] Suspension of the protective order vitiated those benefits.

To be sure, a tenant's violation of a protective order may result in the imposition of severe sanctions, so it is appropriate for the court to consider the tenant's financial situation – "the limits . . . [the tenant] could pay without having to move."[46] This consideration may have been on the judge's mind when he decided to suspend the protective order indefinitely. However, that consideration can only go so far, and we are not suggesting that Mr. Pearson is entitled to a reduction in his protective order payments. "To put it in the vernacular, if you cannot pay the rent, you cannot stay on in the landlord's apartment. It is just about as simple as that."[47] We have admonished courts to consider "the landlord's need for interim

---

[44] *Davis*, 456 A.2d at 823 (plurality opinion) (quoting *Bell*, 430 F.2d at 482).

[45] *Id.* at 824 (quoting *McNeal v. Habib*, 346 A.2d 508, 512 (D.C. 1975)).

[46] *Graham*, 19 A.3d at 367.

[47] *Mahdi*, 433 A.2d at 1088 (quoting *Arthur E. Morrisette Real Estate*, 109 Daily Wash. L. Rptr. 901).

protection,"[48] with a "presumption that the existing rent provides the measure of a just protective order."[49] But if the judge "mak[es] [a] predictive judgment" that Mr. Pearson is likely to succeed in reducing his rent obligation or in securing a greater award in the RHC – which can be assessed with reference to provisional rulings by the ALJ and RHC, the alleged housing code violations, and any corrective measures that the landlord has taken[50] – then Mr. Pearson's ability to pay may be an especially potent factor. But those will be issues for the judge on remand, as we are in no position to assess them in this appeal.[51]

For the foregoing reasons, we vacate the order suspending the protective order and remand for further proceedings consistent with this opinion.[52]

---

[48] *Stets v. Featherstone*, 754 A.2d 292, 296 (D.C. 2000). We have rejected narrowly defining the landlord's "need" as the "risk [of] foreclosure or a net operating loss without a protective order," *Graham*, 19 A.3d at 365-66, although a landlord's "exigency" remains an important factor, *id.* at 367; *see also Davis*, 456 A.2d at 827 (plurality opinion) ("[T]he Constitution expressly protects against confiscation of private property or the income therefrom." (quoting *Lindsey*, 405 U.S. at 74)).

[49] *Graham*, 19 A.3d at 366.

[50] *Id.*

[51] But see footnote 35, *supra*.

[52] Ms. Brown claims that the court also abused its discretion when it denied her motion for sanctions. Our jurisdiction to reach that question is doubtful at best. *Cf. In re Estate of Murrell*, 878 A.2d 462, 465 (D.C. 2005) ("Because Wallace was

*So ordered.*

---

neither held in contempt nor sanctioned, there is no basis for this appeal."). In any event, we do not see how the court abused its discretion in this regard. When the court issued its decision, Mr. Pearson had missed only one payment, and Ms. Brown indisputably owed him money he could have used to make that payment. *See Davis*, 456 A.2d at 826 (plurality opinion) (explaining that the extent of compliance and reasons for noncompliance are important considerations for a motion for sanctions).

Finally, we decline to address on the merits Mr. Pearson's argument that the court erred in denying his motion to dismiss the action for possession. Mr. Pearson did not file a cross-appeal. And in any event, "[a]n order denying a motion to dismiss ordinarily does not meet [the] standard of finality and usually is not immediately appealable." *Heard v. Johnson*, 810 A.2d 871, 876 (D.C. 2002) (footnote omitted). Mr. Pearson has made no attempt to show that this case falls under an exception to that general rule.